CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED

MAR 17 2009

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

|  |  |  |
|---|---|---|
| CAROLINE B. EMSWILER, | ) | |
| | ) | Civil Action No. 5:08CV00011 |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | |
| | ) | By:  Hon. Glen E. Conrad |
| GREAT EASTERN RESORT CORP., et al., | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

The plaintiff, Caroline B. Emswiler, filed this action under the Equal Pay Act of 1963, 29

U.S.C. § 206(d), et seq., asserting that she was compensated at a lower rate of pay than her three

male successors as General Manager of the Massanutten Resort, which is operated by defendant

Great Eastern Resort Management, Inc.  The defendants have now filed a motion for summary

judgment, claiming that the plaintiff has not made out her prima facie case under the Equal Pay

Act and that, even if she has done so, they have properly proven an affirmative defense under the

Act.  For the reasons set forth below, the court agrees that the plaintiff has not made out her

prima facie case under the Act.  Therefore, the court will grant the defendants' motion for

summary judgment.

## FACTUAL BACKGROUND

The Massanutten Resort ("Massanutten") is located in Rockingham County, Virginia on

approximately 6,000 acres on and around Massanutten Peak.  In 1986, Massanutten encompassed

one 140-unit timeshare project called Mountainside Villas and employed approximately 350

employees, including some seasonal part-time workers.  At the present time, Massanutten

includes five different timeshare operations, 240 rooms of hotel accommodations, four pools,

two golf courses, a spa, ski trails, and several on-site retail stores. In December 2005, an 86,000 square foot indoor water park was added to the resort's amenities. At that time, Massanutten had over 1,000 full-time employees along with approximately 200 seasonal part-time workers.

Defendant Great Eastern Resort Corporation is the developer of Massanutten and handles construction and sale of the time share units at the resort. Great Eastern Resort Corporation ("GERC") also owns Peak Construction, a construction company which is the general contractor for all construction projects at Massanutten. Mak Koebig ("Koebig") has been the President of Peak Construction since 1996. Defendant Great Eastern Resort Management, Inc. ("GERM") is the management company for Massanutten and, as such, handles all day to day operations of the resort. C. Dice Hammer ("Hammer") is the President of GERM. Both GERC and GERM are wholly owned by defendant The Resorts Companies, Inc.

The plaintiff, Caroline B. Emswiler ("Emswiler") was hired by GERC in 1985 to serve as its Director of Public Relations. In 1986, Emswiler was hired by GERM as Massanutten's General Manager, reporting directly to Hammer. Prior to working at Massanutten, Emswiler had worked at Bryce Resort from 1970 to 1973 and 1979 to 1981, first processing sales documents and then as the Director of Public Relations. Emswiler also worked at ARA Virginia Skyline Corporation from 1973 to 1976 as its Director of Sales and at Alexander Properties from 1981 to 1985 as its Executive Vice President, overseeing the timeshare operation at Bryce Resort.

During the last full year Emswiler worked at Massanutten, virtually all of the resort's departments reported to her, including: Domestic Services, Physical Plant, Ski Area, Replacements/Refurbishments, Golf Operations, Recreations, Aquatics, Human Resources, Front Desk/Hotel Manager, Time Share Administration, Association Reservations, Rentals, Media

2

Relations, Retail Operations, Risk Management, Collections, Information Technology, Security/Special Services, and Accounting. Emswiler also had responsibility for four owners' associations and two country clubs. Although the indoor water park did not open until after Emswiler stepped down from full-time employment, as hereinafter described, she participated in the preliminary planning process for this new endeavor.

In March 2005, Emswiler informed Hammer that she planned to retire from her position as General Manager of Massanutten; however, she proposed that she remain employed on a part-time basis working on specific projects as a Special Assistant to the Vice President. These projects would include certain tasks for which she had been responsible as General Manager, including the preparation of monthly inventory reports, annual reports to the Real Estate Board and annual reports for marketing purposes, as well as the handling of liability claims and foreclosures. Hammer agreed to her proposal. At that time, Emswiler was earning an annual salary of $137,764.80, plus benefits including vacation and sick pay, health insurance, and participation in the employee stock ownership plan. Based upon this level of compensation, Emswiler proposed that she be paid $75.00 per hour ($64.00 per hour plus $11.00 per hour to account for benefits) once she moved to a part-time basis, working approximately 20 hours per week. Emswiler retired as General Manager on July 22, 2005.

Prior to her retirement, Emswiler had hired Richard "Clay" Rice ("Rice") as her assistant in January 2003. In this capacity, Rice performed tasks as directed by Emswiler and spent approximately 20 to 25 hours per week out of the office on the resort property. Rice also spent a significant amount of time on the development of the new indoor water park.

After Emswiler stepped down as General Manager, three male individuals took over

3

various portions of her responsibilities: Rice, Koebig, and John Loeblich. The defendants claim that this step was part of a general reorganization of GERM. The plaintiff contends, however, that the day-to-day operations and responsibilities remained essentially the same. In any case, John Loeblich ("Loeblich") was hired to be the new General Manager of the resort at a salary of $113,950 per year. Originally, both Loeblich and GERM assumed that Loeblich would take over all the responsibilities held by Emswiler prior to her retirement. However, after Loeblich was hired, but before he began his employment at the resort, Koebig, who had been made a Vice President of Development of both GERM and GERC in 2001, was instead placed in the position of ultimate responsibility for Massanutten's operations, reporting directly to Hammer. Under the new organization's structure, Loeblich would report to Koebig and was to be responsible only for the front desk, administration, refurbishments/replacements, and the owners' associations. Rice, previously Emswiler's assistant, was designated as Enterprise Manager and was given the responsibility for ski operations, golf operations, recreation operations, retail operations, aquatics, and the water park. Rice was paid $82,000 per year as Enterprise Manager, and also reported directly to Koebig.

Koebig retained his responsibilities at Peak Construction and did not immediately receive any additional compensation for assuming his new responsibilities at Massanutten, maintaining his then annual salary of $242,712. Koebig did receive a 4.5% raise in October 2005, however, and Peak Construction began charging $37.42 per hour of Koebig's salary (approximately 33%) to GERM on an internal basis in September 2005. In addition to Rice and Loeblich, Tom Waterbury, the Controller; Tommy Thompson of Domestic Services; and Mike Shiflett of Physical Plant also reported to Koebig.

Loeblich was terminated in May of 2006. The title of General Manager was phased out at that time and replaced with the title of Director of Hospitality Services. Candace Matthews was given this position after Loeblich's departure. Prior to her promotion, Matthews had worked as the administrative assistant for Emswiler and then for both Loeblich and Rice. Upon her promotion, Matthews' salary was set at an annual level of $70,000. Rice's title of Enterprise Manager was then changed to Director of Business Operations. However, Rice resigned from his employment with GERM in July 2007.

Emswiler continued to work part-time for GERM until she resigned on June 27, 2007, apparently after she discovered the amount of Koebig's annual salary. The plaintiff then filed this action on February 6, 2008 under the Equal Pay Act of 1963, 29 U.S.C. §§ 206 et seq. and 28 U.S.C. § 1343(4), claiming that she was compensated at a lower rate of pay than her three comparable male successors because of her sex. The plaintiff now asks the court to require the defendants to pay her damages in the amount of the difference in pay between the total amount of salary, deferred income, profit-sharing, guarantees, bonuses, expense accounts, gas and travel allowance, vacation and other benefits, 401(k), ESOP, perquisites, other fringe benefits including medical or life insurance, and any other type of compensation collectively paid to her three male successors and the total amount paid to the plaintiff, during both the period she worked as General Manager and the subsequent period in which she worked part-time as the Special Assistant to the General Manager. The defendants have filed this motion for summary judgment to which the plaintiff has filed a response. The parties appeared before the court for a hearing on the defendants' motion which is now ripe for review.

5

## STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is properly granted if "there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Industries, Inc., 763 F.2d 604, 610 (4th Cir. 1985). When a motion for summary judgment is supported by affidavits or other evidence as provided for in Rule 56, the opposing party may not rest upon the allegations in the pleadings and must, instead, present evidence showing that there is a genuine issue for trial. If the adverse party fails to present such evidence, summary judgment, if appropriate, should be entered. Fed. R. Civ. P. 56(e); Atkinson v. Bass, 579 F.2d 865, 866 (4th Cir.), cert. denied, 439 U.S. 1003 (1978).

## DISCUSSION

Under the Equal Pay Act of 1963,

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

6

29 U.S.C. § 206(d)(1). In order to make out a prima facie case under the Act, a plaintiff must demonstrate that (1) an employer has paid different wages to employees of opposite sexes for equal work (2) in jobs which require equal skill, effort and responsibility and which are performed under similar working conditions. Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 343 (4th Cir. 1994). In this regard, "equal means *substantially equal*." Wheatley v. Wicomico County, Maryland, 390 F.3d 328, 332 (4th Cir. 2004) (internal citations omitted) (emphasis in original). In making these comparisons, "the plaintiff must identify a particular male 'comparator' for purposes of the inquiry, and may not compare herself to a hypothetical or 'composite' male." Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 948 (4th Cir. 1995).

## I.     **Applicable Statute of Limitations**

An action under the Equal Pay Act must be commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued. 29 U.S.C. § 255(a). Emswiler has alleged that the Equal Pay Act violation in this case was willful and that the three year limitations period should apply, based primarily upon the fact that the three male comparators she identifies were collectively being paid substantially more than she was paid. The defendants contend that this allegation is insufficient to support a finding of willfulness and that the two year limitations period should apply.

In order to prove a willful violation of the Act, a plaintiff must demonstrate that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988). Mere negligence is not sufficient. Id. Willfulness is a factual determination that is typically submitted

to the jury. Fowler v. Land Mgmt. Groupe, Inc., 978 F.2d 158, 163 (4th Cir. 1992). Therefore, on a motion for summary judgment on this issue, the court "is limited to determining whether Plaintiff has adduced sufficient evidence upon which a reasonable jury could find in her favor." Glunt v. GES Exposition Servs., Inc., 123 F. Supp. 2d 847, 861 (D. Md. 2000). In Glunt, for example, the Court found that a reasonable jury could make a finding that there had been a willful violation of the Act in light of evidence that there was a pattern of pay disparities between male and female employees, that the plaintiff's employer knew her work was superior to others yet her salary was not commensurate with her performance, and that one of the plaintiff's subordinates was paid more than she was. Id.

As previously stated, the defendants argue that there is no evidence of willfulness in this case. The defendants note that, with the exception of only her own salary, Emswiler herself recommended the salaries and wages to be paid to all the other employees of the resort and that she was never instructed to set female employees' salaries below those of male employees. The defendants also note that no Equal Pay Act complaints or lawsuits have been filed against GERM prior to the instant action.

The defendants also point to the holding of the Eastern District of Virginia in Collins v. Landmark Military Newspapers, Inc., 2007 WL 2301549 (E.D. Va. 2007). In Collins, in an unpublished opinion, the Court found that the plaintiff had adduced evidence that she believed her supervisor viewed women differently than men, that there was a difference in pay between herself and her comparators, that another employee had allegedly stated that she would not be treated fairly by her supervisor, that her supervisor had conceded that her starting salary was set too low, and that her employer had used various excuses to justify differences in pay among its

8

employees. 2007 WL 2301549, at * 11. The Court held that this evidence did not show willfulness, however, but was "merely relevant to a general violation of the Equal Pay Act." Id. Therefore, the Court held that the two year limitations period would apply. Id. The defendants contend that, as in Collins, Emswiler is merely offering evidence of a pay differential between herself and her successors and has adduced no evidence showing that the defendants treated men and women any differently in respect to their pay. Therefore, the defendants argue that the two year limitations period should apply.

The plaintiff responds that the defendants knowingly divided her responsibilities among her three male successors, collectively paying them twice the amount paid to her for completing the same or even a smaller number of tasks, given that she retained some of her previous responsibilities as the Special Assistant to the General Manager. Therefore, the plaintiff maintains that this purposeful action demonstrates the level of willfulness required by the Act. Emswiler also notes that Candace Matthews ("Matthews"), the female replacement for Loeblich following his termination, was paid only $70,000, almost $43,000 less than Loeblich received. The plaintiff contends that this disparity also illustrates the defendants' discriminatory attitude toward their top-level female employees.

Emswiler also points to certain other actions on the part of Hammer and Koebig in support of her argument that the violation in this case was willful. In particular, Emswiler testified at her deposition that she received a larger than normal raise only in the year in which she was divorced from her husband. She further stated that Hammer told her at that time that he gave her the raise because she was now on her own. On a separate occasion, Koebig, though not her supervisor, gave Emswiler a poster and T-shirt stating "WARNING' You are looking at a

9

HIGH PERFORMANCE WOMAN . . . I can go from 0 to BITCH in 2.1 seconds!" Koebig also allegedly circulated emails which contained images of naked women. Emswiler argues that this evidence demonstrates gender animus on the part of the senior management of the defendants.

In response to Emswiler's contentions regarding Matthews, the defendants point out that GERM had again been restructured at the time Matthews was promoted in 2006, and that all of the managers who directly reported to Koebig at that time, including Matthews, were then paid annual salaries in the $70,000 to $80,000 range. Furthermore, Kenny Hess, who replaced Rice after he left GERM, and Matthews were both paid identical salaries as of October 1, 2007. Thus, the defendants contend that there is no inference of gender bias to be drawn from Matthews' salary.

With regard to Emswiler's allegations that Hammer gave her a larger than usual raise only after her divorce, the defendants contend that there is nothing in the record to indicate it was done for reasons of her gender. The defendants have also included the affidavit of Becky Foster, who interacted with the plaintiff during her tenure as General Manager.[1] In that affidavit, Foster states that Emswiler often related that she needed to make more money for personal reasons such as her son's education and house maintenance.

As to the allegations regarding the poster and T-shirt from Koebig, the defendants have submitted an affidavit from Koebig stating that Emswiler herself often used the term "bitch" when referring to subordinate employees and political figures such as Hillary Clinton. Koebig

---

[1] The plaintiff filed a motion to strike Foster's affidavit in its entirety, claiming that Foster has not been properly identified as a witness with regard to the subjects discussed in the affidavit, but only as a potential Rule 30(b)(6) witness with regard to incidents of sexual harassment or sex discrimination at Massanutten. In an order entered February 5, 2009, after the hearing of this matter, the court denied the plaintiff's motion to strike Foster's affidavit. However, the court agreed it would not consider that portion of the affidavit relating to Foster's opinions as to matters at issue. The statements referred to here, however, are properly considered by the court.

states that he gave the items to Emswiler in good nature and in light of the fact that she frequently used the term, even to describe herself. Koebig also notes that Emswiler never complained about these items.

In considering the evidence surrounding the statute of limitations willfulness issue, the court first notes that, in relation to the emails and T-shirt allegedly received by Emswiler from Koebig, Koebig was neither Emswiler's supervisor nor did he have any authority with regard to setting salary levels at GERM at the time Emswiler's salary and raises were determined. Therefore, the court does not find this evidence purporting to show gender bias on the part of Koebig to be particularly relevant to a determination of the defendants' willfulness under the Act.

Nevertheless, the court agrees that a reasonable jury, if it found a violation of the Act, could also find that the violation was willful. It is true that the Collins Court concluded that evidence of a difference in pay between Collins and her male comparators along with other evidence that suggested gender bias was not sufficient to demonstrate a willful violation. However, Collins was inconsistent in her allegations of willfulness, first stating in her deposition that her supervisor did not intentionally discriminate against her and only later submitting a declaration claiming that his actions were, in fact, intentional. Collins, supra, 2007 WL 2301549, at * 11. By contrast, Emswiler included an allegation of willfulness in her initial complaint and also points to compensation differences along with Hammer's alleged comments regarding his reasons for giving her a larger than normal raise at the time of her divorce. Therefore, the court finds that the plaintiff has adduced sufficient evidence to raise a question for the jury as to whether any violation of the Equal Pay Act, if proven, may have been willful. As a result, the court will apply the three year limitations period in considering the record for purposes of the

11

defendants' motion for summary judgment.

## II.     Whether the Plaintiff Has Made Out Her Prima Facie Case

As previously stated, in order to make out a prima facie case under the Equal Pay Act, a plaintiff must demonstrate that (1) an employer has paid different wages to employees of opposite sexes for equal work (2) in jobs which require equal skill, effort and responsibility and which are performed under similar working conditions.  Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 343 (4th Cir. 1994).  In considering the level of skill required, a court may consider factors such as "experience, training, education, and ability.  Effort refers to the physical or mental exertion necessary to the performance of a job.  Responsibility concerns the degree of accountability required in performing a job." Griffiths v. Winnebago Indus., Inc., 369 F. Supp. 2d 1063, 1070 (N.D. Iowa 2005) (quoting Berg v. Norand Corp., 169 F.3d 1140, 1146 (8th Cir. 1999)).

### A.     Proper Comparators of the Opposite Sex Under the Equal Pay Act

The defendants contend that the three comparators selected by Emswiler, i.e., Loeblich, Koebig, and Rice, are not proper comparators under the Equal Pay Act in the first instance.  In Strag, supra, the United States Court of Appeals for the Fourth Circuit held that the plaintiff "must identify a particular male 'comparator' for purposes of the inquiry, and may not compare herself to a hypothetical or 'composite' male." 55 F.3d at 948.  See also, Wheatley, supra, 390 F.3d at 334 (holding that plaintiffs need not "identify one specific individual who constitutes a perfect male comparator," but that a comparison to a male employee must be made "'factor by factor' and cannot be made to a hypothetical male with a composite average of a group's skill, effort, and responsibility").  The defendants maintain that Emswiler is required to identify a

12

single, particular male comparator in order to make out her prima facie case and that she is improperly attempting to compare her salary to that of a hypothetical or composite male who is the sum of three separate individuals. The defendants acknowledge that the plaintiff could identify multiple male comparators with whom to compare her wages if they all individually shared equal job responsibilities, but claim it is improper to then presume she can compare her salary to the cumulative wages paid to three different individuals, no one of whom has a substantially equal job. Ultimately, then, the defendants conclude that Emswiler has failed to establish the first prong of her prima facie case in that she cannot prove she was paid less than one particular employee of the opposite sex. The plaintiff responds that, because her former position of General Manager was divided between three specific male successors, the only rational comparison in this case is between herself and those three individuals collectively.

The court agrees that Emswiler has not compared herself to a hypothetical composite male, but rather to a combination of the three particular, identifiable persons who succeeded her. There is no dispute that a court may properly consider comparisons to successors rather than only to a contemporaneous male employee. See, e.g., Broadus v. O.K. Indus., Inc., 226 F.3d 937, 941-42 (8th Cir. 2000) (holding that even a non-immediate successor may be an appropriate comparator); E.E.O.C. v. First Citizens Bank of Billings, 758 F.2d 397, 402 (9th Cir. 1985) (finding that a plaintiff may prove a violation of the Equal Pay Act by comparing her salary to that of a male successor). Furthermore, as the Court noted in Wheatley, supra, a plaintiff is not required to "identify one specific individual who constitutes a perfect male comparator." 390 F.3d at 334. In this case, there is no single successor with whom Emswiler may compare her compensation because no one person assumed all of the General Manager's responsibilities after

13

the plaintiff stepped down from full-time employment. Even the defendants admit that these three individuals alone took over various portions of Emswiler's duties after she moved to her part-time position, even though they also contend that new responsibilities were added at that time. Therefore, the court finds the comparison between Emswiler and a combination of Koebig, Loeblich, and Rice to be appropriate under the facts of this case.

In a related argument, the defendants also assert that Emswiler has no claim under the Equal Pay Act because she was the highest paid employee of GERM, both when she worked full-time and also after she stepped down to part-time work, when examining her compensation level on an hourly basis.[2] Emswiler's annual salary at the time of her retirement was approximately $137,765, while Loeblich was hired at the lower annual salary of $113,950. Rice was paid $78,000 annually in his position as Emswiler's assistant prior to her retirement, and his annual salary at the time of his termination two years later in July 2007 had increased to only $85,196.80. Furthermore, Koebig originally received no increase in compensation for his work for GERM and later received a small raise of $11,000 in October 2006. Nevertheless, one third of Koebig's salary from Peak Construction was ultimately charged to GERM, i.e., $85,970.50 in 2006. Therefore, while Emswiler was working on a part-time basis, she was compensated at $75.00 per hour compared to an hourly rate for Loeblich of $54.72 per hour ($65.72 per hour assuming $11.00 per hour for benefits); an hourly rate for Rice of $39.38 per hour ($50.38 with benefits); and an hourly rate of $37.42 per hour for Koebig's time charged to GERM ($48.42

---

[2] Because the court has determined that it will apply the three year limitations period for purposes of this motion for summary judgment, the relevant time period is from February 7, 2005 through February 7, 2008, the date Emswiler filed her complaint. During this period, Emswiler worked as the General Manager of Massanutten from February 7, 2005 through July 22, 2005, and worked part-time as the Special Assistant to the General Manager from July 23, 2005 through her resignation on June 27, 2007.

14

with benefits). Thus, the defendants contend that Emswiler simply cannot succeed on a claim under the Equal Pay Act because, on an individual basis, she was consistently the most highly compensated employee of GERM.

The court first notes that the defendants' comparison of Emswiler's pay to that of Koebig, Loeblich, and Rice separately is not dispositive of the inquiry, given the previous ruling that the appropriate comparison is to the aggregate compensation of Koebig, Loeblich, and Rice, as previously set forth. While the court has accepted the plaintiff's arguments in this regard, however, the court also notes that the comparison plaintiff proposes is made difficult based, in part, upon the inclusion of Rice as one of the three comparators. This individual was employed by GERM prior to Emswiler's retirement, was not replaced after she stepped down, and appears to have performed some of the same functions both before and after her retirement, especially with regard to the development of the indoor water park. It is true that Rice was given additional responsibilities when he assumed the role of Enterprise Manager, however, he received only a small increase in pay at that time and his compensation level did not substantially increase for the subsequent two years before his resignation. Therefore, while the court believes that Rice, in conjunction with Koebig and Loeblich, is an appropriate comparator under the Equal Pay Act because he did assume some of Emswiler's duties after she retired, it also appears that some of his responsibilities may have been simply carried over from his previous position under Emswiler. But in any case, the fact that Emswiler was paid more than Loeblich, Rice, or Koebig (based on the charge to GERM for Koebig's services) is simply not relevant to her claim under the Equal Pay Act as the court has construed it. Thus, for purposes of this opinion, the court will adopt the comparison proposed by plaintiff.

15

**B.** **Whether the Plaintiff's Job Was Substantially Equal to That Performed By the Three Male Comparators**

1.  General Considerations

In determining whether jobs are substantially equal for purposes of the Equal Pay Act, a plaintiff need not show that her position and that of her male comparator are identical in every respect. Glunt v. GES Exposition Servs., Inc., 123 F. Supp. 2d 847, 856 (D. Md. 2000). Instead, rather than relying upon particular job titles, a plaintiff "must show that she and her male counterpart performed substantially equal work in terms of 'skill, effort, and responsibility.'" Id. (quoting Hodgson v. Fairmont Supply Co., 454 F.2d 490, 493 (4th Cir. 1972)). Nevertheless, a job will not automatically be deemed to involve equal effort or responsibility simply because it includes most of the same general duties. Wheatley, supra, 390 F.3d at 333. A job will be considered unequal "despite having the same general core responsibilities - if the more highly paid job involves additional tasks which (1) require extra effort . . . (2) consume a significant amount of the time . . . and (3) are of an economic value commensurate with the pay differential." Id. (citing Hodgson, supra, 454 F.2d at 493).

2.  Plaintiff's Claim for Unequal Wages During Her Post Retirement Period

The defendants first contend that Emswiler cannot make out a prima facie case under the Equal Pay Act for the period during which she was working part-time as the Special Assistant to the General Manager because she was not performing substantially equal work as that of her male successors during this time period. The court is constrained to agree. Once she retired as the full-time General Manager, Emswiler no longer had any supervisory or management responsibilities and performed only a small subset of the tasks she previously dealt with as

16

General Manager. As a result, the plaintiff cannot compare her part-time position to any other job which required equal skill, effort, and responsibility and which was performed under similar working conditions. Instead, it is undisputed that Emswiler's part-time position at Massanutten was unique.

The plaintiff argues that she would have negotiated a higher hourly rate for her part-time work if she had been aware that GERM would pay her male successors a substantially higher combined salary than what she had been paid as General Manager. While it is possible that such an argument might support a claim under Title VII, the Equal Pay Act requires a comparison between the duties involved in a particular job or jobs. When these jobs are no longer substantially equal, there can be no claim under the Act. To do otherwise in this case would extend the period for a potential claim indefinitely during a time frame in which there might be substantial changes in job responsibilities or in the organization of the company, as apparently occurred at GERM, regardless of the level of compensation of successors down the line, either immediate or non-immediate. The court does not believe that such a result is justified under the language of the Act.[3] Therefore, the court will consider the plaintiff's claims only as they relate to her level of compensation while the full-time General Manager of Massanutten as compared to that of her three male successors collectively.

3.      Plaintiff's Claim for Unequal Wages for Her Job as General Manager

a.      The Parties' Comparisons of the Jobs Performed by Emswiler and Her Successors

         The defendants also maintain that Emswiler is unable to prove that the work she

---

[3] In passing, the court again notes that the plaintiff made the decision to semi-retire and assume part-time duties, and that her employer in no way encouraged the changes in her responsibilities or remuneration.

Case 5:08-cv-00011-GEC-BWC   Document 105   Filed 03/17/09   Page 17 of 28   Pageid#: 740

performed as General Manager was substantially equal in skill, effort, and responsibility, and was rendered under similar working conditions, as compared to that performed by her three male successors. Instead, the defendants point to a number of differences between the position as it existed when Emswiler was the General Manager of the resort and at a point in time when Koebig, Loeblich, and Rice assumed many of her responsibilities after Emswiler left her full-time employment. Specifically, the defendants contend that: (1) the level of effort invested by the plaintiff's three male successors was greater as evidenced by the significantly higher number of hours spent per week in their positions with GERM; (2) the duties performed by Loeblich involved a higher degree of skill based upon his creation of daily flash reports; (3) both Loeblich and Rice spent a large portion of their time out on the resort grounds whereas Emswiler had spent almost all of her working hours in the office; (4) the new management team had the responsibility for the staffing and operation of the indoor water park, which had not yet been constructed during Emswiler's tenure; (5) the addition of Koebig to the management team represented an attempt on the part of Hammer to introduce a new level of management to the organization that had not previously been present; and (6) unlike Emswiler, Koebig was specifically tasked with the responsibility for long-range planning, growth of profitability, and developing a reorganization plan for the resort. The plaintiff, on the other hand, responds that the defendants are simply attempting to mask the comparability of her position to the combination of the three held by her successors in arguing that her position, and the management of GERM as a whole, was restructured when it was, in fact, substantially equal.

First, when comparing the collective effort expended by Koebig, Loeblich, and Rice with that of Emswiler while she was General Manager of the resort, the defendants note that the total

time Rice, Loeblich, and Koebig spent on their duties for the resort amounted to approximately 127 hours per week. Specifically, Rice testified at his deposition that he worked approximately 50 hours per week; Loeblich testified at his deposition that he worked between 60 and 70 hours per week; and one third of Koebig's 50 hour work week was also allocated to GERM, i.e., approximately 17 hours. There is no dispute that the total hours worked by Koebig, Loeblich, and Rice on behalf of GERM was significantly higher than the 50 hours per week worked by Emswiler as General Manager prior to her retirement.

Emswiler contends, however, that such a comparison of total hours worked is not relevant in determining whether she received equal pay for equal work. Specifically, the plaintiff argues that, while these three men were collectively paid an annual salary of approximately $273,000 for their work for GERM, almost double her annual salary of $137,000, they assumed no significant new tasks, duties, or responsibilities. None of the parties dispute the fact that the new management team collectively supervised the same departments as Emswiler had previously. The defendants note, however, that the hours worked by Emswiler were only 39% of those worked by her three male successors, representing a significantly greater amount of effort expended on the part of those individuals.

With regard to the daily flash reports, the defendants note that Loeblich developed these reports personally, writing their basic formulae for analyzing revenue data on a daily basis. The defendants contend that Emswiler did not have the computer skills to create these reports. Emswiler admits that she did not prepare daily flash reports. However, she states that she did receive and analyze daily revenue reports from golf and ski operations while she was General Manager. As Emswiler notes, Loeblich admitted during his deposition that he was not tasked

19

with the responsibility to create the flash reports until two and half to three months after he began his employment with GERM. See Loeblich Deposition at 83:23-84:4. Therefore, the plaintiff argues that any differences between her responsibilities and those of her successor with regard to reporting and revenue analysis were inconsequential and insubstantial.

The defendants also contend that Emswiler's three successors did not perform their jobs under similar working conditions in that both Loeblich and Rice were tasked with spending a significant amount of their time out on the resort property. Emswiler, on the other hand, performed virtually all of her duties in the office. In addition, Rice spent more than half of his time on the final construction, opening, and operation of the indoor water park. None of the parties dispute that Emswiler was involved in the early planning stages for the new water park. The defendants argue, however, that the operation of the water park was a significant new responsibility for the Koebig-Loeblich-Rice team, involving a large addition of new staff and greater responsibilities. Emswiler responds that, as the General Manager, she would have borne an equal amount of responsibility for the water park had she remained in that position and that the addition of the water park was not unlike the addition of any new amenity, such as a new ski run or new spa facility. Hammer, however, testified at his deposition that, had Emswiler remained in her position, he would have needed to add additional management assistance to deal with the operation of the water park. See Hammer Deposition at 115:18-116:3.

With regard to the addition of Koebig to the Massanutten management team, the defendants contend that Koebig was tasked with reorganizing the company in conjunction with Hammer, focusing on long-range planning for the resort, increasing profitability, and discharging the General Manager's previously existing responsibility for overseeing day-to-day operations of

20

the resort. In addition, Koebig represented a new level of management at Massanutten in that both Loeblich and Rice, who each took over responsibility for certain departments, reported directly to him, and Koebig alone reported to Hammer. According to the defendants, Emswiler's responsibilities did not include these significant new management and long-range planning responsibilities. Thus, the defendants contend that this disparity in responsibilities clearly establishes that the plaintiff's old job as General Manager was not substantially equal to the new combined jobs held by Koebig, Loeblich, and Rice.

The plaintiff again responds that any differences between her management responsibilities and those of Koebig were inconsequential and insubstantial. In his deposition, Hammer stated that Koebig "assumed the overall supervision and management of the responsibilities that the general manager had." See Hammer Deposition at 102. When asked whether Koebig had assumed any duties and responsibilities that had not been duties and responsibilities held by Emswiler, Hammer responded that he had not. Id. at 116. Hammer also admitted that, even prior to Emswiler's departure, Koebig already had responsibility for some long-range planning as Vice President of Development for the entire organization. Id. at 114. Therefore, Emswiler concludes that these responsibilities were not based upon Koebig's new role, but merely an extension of his old role.

b.      Analysis of the Plaintiff's Claims Under the Equal Pay Act

In resolving this claim under the Equal Pay Act, the court must compare the skill, effort, and responsibility involved in the job Emswiler held as General Manager with the combination of jobs held by Koebig, Loeblich, and Rice after her retirement. This analysis is made significantly more difficult in the instant case, however, where the organization and position was

21

restructured after the voluntary departure of the party complaining of a violation of the Act. Nevertheless, it is true that other plaintiffs have been successful in making out a claim under the Equal Pay Act in the face of a reorganization under certain circumstances. In <u>Cuffee v. Dover Wipes Co.</u>, 334 F. Supp. 2d 565 (D. Del. 2004), for example, the defendant had argued that the duties of the comparator selected by the plaintiff in that case were divided among four different successors, including the plaintiff, and that, as a result, the plaintiff could not demonstrate that his job was sufficiently similar to his female predecessor. On a motion for summary judgment, however, the Court held that, based upon the plaintiff's statements regarding his job duties as well as those performed by his predecessor and the lack of any written job descriptions at the defendant company, "a reasonable jury could choose to believe the plaintiff's statements that his job was substantially similar to Ms. Varacalli's job." 334 F. Supp. 2d at 576. Therefore, the Court denied the motion for summary judgment. <u>Id.</u> at 577.

Likewise, in <u>Arrington v. Cobb County</u>, 139 F.3d 865 (11th Cir. 1998), the Eleventh Circuit reversed the entry of summary judgment by the district court because it found that there remained a material question of fact with regard to whether the plaintiff's duties as Assistant Fire Chief were substantially equal to those performed by a comparator in the subsequently created position of Deputy Chief. Arrington had worked for the Cobb County Fire Department for over twenty years, during the last ten of which she held the position of Assistant Fire Chief for Administration. 139 F.3d at 868. Arrington had never worked in an active firefighting position, however. <u>Id.</u> The county's Fire Chief agreed with a management study which concluded that Arrington functioned as the Chief's second in command for both operations and administration, although another individual actually held the position of Assistant Chief for Operations. <u>Id.</u> at

868-69. After the Fire Chief retired, the county decided to restructure its public safety agencies, including the Fire Department. Id. at 869. Although Arrington applied for the new Fire Chief position, another individual was selected. The new Fire Chief decided to consolidate the two Assistant Fire Chief positions (Administration and Operations) into one Deputy Chief position. Id. Arrington again applied for this new position. However, she was passed over in favor of a male applicant and was then demoted to Lieutenant, ostensibly because of her lack of operational experience. Id. at 870. After she was demoted, Arrington filed suit, including a claim under the Equal Pay Act alleging that her successor, the Deputy Chief, was paid a higher salary than she received as Assistant Chief.

The Court first held that the Equal Pay Act will apply "when a plaintiff alleges an inequality between her pay and that of her successor." Id. at 876 n. 22. The Court went on to find that a jury could "reasonably conclude that the Deputy and Assistant Chief positions are 'substantially equal.'" Id. at 876. Although the defendants had attempted to emphasize the difference in formal job titles and job descriptions, the Court held that they had failed to respond to the evidence submitted by Arrington which demonstrated that she had exercised quite a wide range of duties as the second in command to the former Fire Chief and that those duties very closely tracked those performed by the new Deputy Chief. Id. Therefore, the Court found that "[a]t a minimum, Arrington has established a material question of fact with regard to her Equal Pay Act claim." Id.

In contrast to the reorganizations described in Cuffee and Arrington, the reason for the restructuring which took place at GERM was Emswiler's voluntary decision to step down from her full-time position as General Manager, so as to begin the process of retirement. In fact,

Hammer testified at his deposition that even before Emswiler announced her plan to retire, he had begun exploring the possible reorganization of his upper management team in light of his plans to eventually step down as president of GERM. See Hammer Deposition at 110:7-14. Although Hammer first decided to hire Loeblich as the General Manager of the resort, he accepted Koebig's offer to assume responsibility for the operations of the resort. Id. at 96:18-100:15. More particularly, Hammer stated that Koebig was brought in as a new, additional level of management, with the expectation that he would be responsible for reorganizing and streamlining the operation, in addition to managing the day-to-day operations of the resort. Id. at 27:16-19; 100:23-101:9. Koebig was also to be charged with increasing Massanutten's profitability and working on the long-range master plan. Id. at 101:14-22; 139:15-21. Hammer's testimony as to Koebig's projected role is essentially undisputed.

The court finds that these new responsibilities assigned to Koebig are crucial in the determination of whether the positions held by Emswiler and by her three male successors collectively were substantially equal. Emswiler admitted during her deposition that she had never been given the responsibility to write any business plans or to develop any strategic or long-range plans for the resort. See Emswiler Deposition at 170:17-23. The plaintiff has argued, however, that Koebig had already participated in long-range planning as Vice President of the organization and that Hammer admitted Koebig had assumed only those duties and responsibilities previously held by Emswiler. The court notes, however, that Hammer's statements with regard to Koebig's duties and responsibilities appear to have been made in the context of a discussion of operational areas. Furthermore, although Koebig may have been somewhat involved in long-range planning for the entire organization before he assumed his new

24

role at GERM, he was given full responsibility for that area once he formally began his job with Massanutten.

The plaintiff also attempts to argue that these new duties were not significant additions, based upon a lack of substantial change in the operations at the resort under Koebig's direction. Rice stated during his deposition that the people who had been in management positions over various departments under Emswiler were still in those same positions under Koebig. Furthermore, Koebig testified that he had prepared no reports or other documentation of his long-range planning activities and that the long-range plan was still "a work in progress." See Koebig Deposition at 60. With regard to the profitability of the resort, although revenues have grown substantially since Emswiler's retirement, net profits have apparently not grown accordingly. Hammer himself testified that the improvements he has seen under Koebig's leadership have consisted primarily of streamlined reporting and better definition of individuals' job responsibilities. See Hammer Deposition at 142. Therefore, Emswiler concludes that any improvements which took place after her departure are minimal and do not demonstrate that the job she performed prior to her retirement and those performed by her successors are not substantially equal.

The court disagrees. The new responsibilities given to Koebig by Hammer with respect to the resort are not merely peripheral duties but are core responsibilities under his new position resulting from the reorganization of the upper management levels at GERM. It may be true that Koebig has not effected sweeping changes in the management of the resort, has not completed the long-range planning process, and has not been as successful as Hammer had hoped in increasing Massanutten's profitability. These facts are simply not relevant in a determination of

25

whether the jobs are substantially equal, however. Instead, the court must examine the primary

functions and duties of the jobs assigned to Emswiler and the Koebig-Loeblich-Rice team. In

that light, it is apparent that Koebig was tasked with important functions which Emswiler was

never required to perform, i.e., adding a new layer of management, long-range planning for the

resort, working to improve profitability, and restructuring the organization in light of Hammer's

stated intention to step down from an active management role in future years. These are core job

responsibilities that Emswiler simply did not perform, making this case distinguishable from

Arrington, supra, where the evidence regarding the duties performed by that plaintiff and her

male successor was sufficient to raise a question of material fact with regard to whether they

were substantially similar. As a result, the court finds as a matter of law that the jobs held by

Emswiler and Koebig, Loeblich, and Rice are not substantially equal.

Certain other differences between the jobs performed by plaintiff and her male successors

also contribute to the court's finding. First, the combined team of Koebig, Loeblich, and Rice

worked substantially more hours than did the plaintiff. A higher level of compensation for

Emswiler's three male successors would be expected, given the greater level of effort expended.

Part of the reason for this increase in hours was the addition of the indoor water park. While it

may be true that Emswiler would have had ultimate management responsibility for the operation

of the water park had she remained in her position as General Manager, Hammer stated that the

resort would have had to hire additional assistance for her after the park opened based upon the

large increase in staff and the complexity of the operation. It is also true that Rice was spending

time on the development of the water park prior to Emswiler's departure. However, after

Emswiler left, Rice was put in charge of that operation, thereby eliminating the need for the

Case 5:08-cv-00011-GEC-BWC   Document 105   Filed 03/17/09   Page 26 of 28   Pageid#: 749

addition of a new assistant. In addition, both Loeblich and Rice spent a large portion of their time out on the resort property, which had been made a requirement of their jobs. By contrast, Emswiler spent almost all of her time while General Manager in the office. The court believes that this undisputed fact is further evidence of the ongoing efforts on the part of Hammer and Koebig to restructure the upper management of the resort, which ultimately resulted in a fundamental change in the day-to-day management of the operation. All of these factors contribute to the court's finding that the jobs performed by Emswiler and the Koebig-Loeblich-Rice team did not require equal skill, effort, and responsibility.[4]

The defendants have also argued that, even if the plaintiff did establish her prima facie case, any pay difference was justified based on a factor other than sex. See 29 U.S.C. § 206(d)(1). However, the court does not find it necessary to address the parties' arguments in this regard because of its finding that Emswiler has failed to prove the elements of her prima facie case under the Act in the first instance. As a result, the defendants' motion for summary judgment will be granted.

---

[4] The court agrees with the plaintiff, however, with regard to the flash reports prepared by Loeblich. The defendants may have found the flash reports helpful and an improvement upon the reports which had previously been available under Emswiler. However, there is no evidence that Loeblich was given the responsibility to develop these reports at either the time he was hired or at the time he began working for GERM. Instead, the idea for the flash reports came about some three months after he was employed at the resort. Therefore, the court does not believe that the evidence regarding the flash reports, standing alone, indicates that the jobs performed by Emswiler and her successors were substantially different. Nevertheless, as previously explained, the court finds that the plaintiff has failed to make out her prima facie case under the Equal Pay Act because she is unable to forecast evidence that her job as General Manager of Massanutten was substantially equal in skill, effort, and responsibility to the combined jobs performed by Koebig, Loeblich, and Rice after her retirement.

Case 5:08-cv-00011-GEC-BWC   Document 105   Filed 03/17/09   Page 27 of 28   Pageid#: 750

The Clerk of Court is hereby directed to send certified copies of this Memorandum

Opinion and the accompanying Order to all counsel of record.

ENTER:       This 17ᵗʰ day of March, 2009.

_____
United States District Judge